UNITED STATES OF AMERICA
DISTRICT COURT FOR THE WESTERN DISTRICT OF MICHIGAN
NORTHERN DIVISION

DAVID ALLEN BLEAU,

    plaintiff,

v.

SIEMENS GAMESA RENEWABLE ENERGY, INC. and KYLE CONNOLLY,

    defendants.
_____/

Case No.

Hon:

## COMPLAINT AND JURY DEMAND

Plaintiff makes his complaint as follows:

### Parties/Jurisdiction/Venue

1. Plaintiff David Bleau ("Mr. Bleau") is a resident of Garden, Delta County, Michigan.

2. Defendant Siemens Gamesa Renewable Energy, Inc. ("Siemens Gamesa") is a foreign profit corporation whose registered office is located at 4400 Alafaya Trail, Q2, Orlando, FL 32826. [Exhibit A.]

3. Defendant Kyle Connolly ("Mr. Connolly") is a resident of Garden, Delta County, Michigan.

4. The events giving rise to this lawsuit occurred at or near Siemens Gamesa's work location in Delta County, Michigan, where Mr. Bleau was employed.

5. This Court has jurisdiction over this action pursuant to 28 U.S.C. § 1331 and Section 16(b) of the Fair Labor Standards Act ("FLSA"), 29 U.S.C. §216(b).

6. This Court also has supplemental jurisdiction over Mr. Bleau's related claims arising under state and local laws pursuant to 28 U.S.C. § 1367(a), to include joinder of Mr. Connolly as a defendant.

7. Supplemental jurisdiction is appropriate because Mr. Bleau's state law claim shares a common nucleus of operative facts with his federal claim and the claims are most efficiently resolved together.

8. Venue is proper in the Western District of Michigan per 28 USC § 1391 (b) (1) and (2), as the cause of action occurred in Delta County, Michigan.

**Facts**

9. Siemens Gamesa is in the renewable energy business, with an emphasis on wind turbine systems.

10. With a worldwide installed capacity of 124 GW, Siemens Gamesa has a presence in more than 100 countries and a team of 27,000 people worldwide.

11. Its end-to-end value chain presence encompasses onshore and offshores wind turbines design, manufacturing, installation as well as cutting-edge service solutions.

12. Siemens Gamesa services and operates two separate wind farms owned by DTE located in the Garden Peninsula known as the "Garden" and "Fairbanks" wind farms.

13. Mr. Bleau began working on these windfarms as a full-time employee of Gamesa Wind US, LLC ("Gamesa") on June 5, 2017, as a service technician.

14. Mr. Bleau was promoted to Tech 1 within his first year of employment and then to Tech 2 within two and one-half years.

15. Tech 2 was the highest level of certification available within Gamesa, it was the equivalent of a "troubleshooter" at Siemens Wind Power, Inc. ("Siemens").

16. As a Tech 2, Mr. Bleau's work assignments included servicing and maintaining wind turbines, troubleshooting errors, and supporting out-of-state customers on-site and remotely.

17. Following a merger between Siemens and Gamesa, Mr. Bleau became employed by Siemens Gamesa and was "grandfathered in" at the highest technician level.

18. Mr. Bleau performed his job capably and was a valued employee.

19. Mr. Bleau was trusted to lead morning briefings with DTE via conference call when his supervisor was not available.

20. He was also asked to lead teams at the Big Turtle site in lower Michigan.

21. He seldom missed work and frequently volunteered to work additional shifts and overtime.

22. While working for Siemens Gamesa, he received regular pay increases.

23. In 2022, his regular bi-weekly salary was $2,442.31 which correlates to $30.53 per hour.

24. In 2023, Mr. Bleau's regular bi-weekly salary was $2,561.09 which correlates to $32.01 per hour.

25. In early 2023, Siemens Gamesa changed payroll systems.

26. Almost immediately, Mr. Bleau began experiencing problems with the payroll system.

27. Some hours that he entered disappeared, while others populated other dates.

28. Mr. Bleau brought these discrepancies to his supervisor, Mr. Connolly's attention.

29. Mr. Bleau was not alone; other employees experienced similar issues with the new pay system.

30. During the two week pay period covering March 6, 2023 through March 19, 2023, Mr. Bleau worked 138.5 hours total, consisting of 80 hours at his regular rate, 40.5 hours of overtime, and 18 hours of double time.

31. On March 24, 2023, however, he was only paid for 80 hours of regular time, 17.5 hours of overtime, and 10 hours of double time.

32. Mr. Bleau did not discover this discrepancy until several weeks later, at which time he promptly brought it to Mr. Connolly's attention.

33. Specifically, on April 10, 2023, during the group morning meeting, Mr. Bleau advised Mr. Connolly that he had a pay shortage issue.

34. Such conversations commonly occurred during the morning meetings as shortages often impacted more than one person.

35. Mr. Connolly advised Mr. Bleau that he needed everything in "black and white" or he couldn't do anything about it.

36. When Mr. Bleau responded by stating that it was all black and white, as he had all his time entered into the system, but he didn't get paid for it, Mr. Connolly indicated he would "look into it."

37. At the end of the day, Mr. Bleau asked Mr. Connolly if he had any luck looking into it and Mr. Connolly responded along the lines of "if I don't have the evidence, there is nothing I can do."

38. Based on this response, Mr. Bleau was left with a firm impression that Mr. Connolly was not going to pursue the issue, so he went home that evening and began to dig further into the pay discrepancy.

39. Not only did Mr. Bleau confirm the recent shortfall, he discovered that a prior shortfall from May of 2022 remained unpaid despite promptly reporting the shortfall to payroll, Mr. Connolly, and James Miller (Mr. Connolly's supervisor at corporate).

40. That night, he notified Mr. Connolly of his discovery by text and requested a time to sit down to go through his payroll discrepancies.

41. He also alerted Mr. Connolly of the fact that he appeared to have been paid for a day he did not work.

42. The morning of April 11, 2023, Mr. Connolly told Mr. Bleau he needed everything in black and white for HR and payroll and authorized Mr. Bleau to document the discrepancies during working hours.

43. The next day, April 12, 2023, Mr. Bleau met with Mr. Connolly for what he believed was a meeting to go through the payroll discrepancies.

44. After briefly reviewing his payroll concerns, Mr. Connolly abruptly shifted gears and told Mr. Bleau that he needed to retroactively take PTO for absences from two months' prior (February 13, 16, and 17) as well as a recent absence on April 3.

45. Mr. Bleau was taken aback, as Mr. Connolly routinely permitted employees to take time off without using PTO and had previously told Mr. Bleau that he did not need to use PTO for his absences in February.

46. After applying PTO retroactively, as instructed, Mr. Bleau had two personal days and about 18 hours of PTO remaining.

47. The morning of April 13, Mr. Bleau reported to work as scheduled.

48. Prior to the morning meeting, he asked Mr. Connolly for an update on his pay discrepancy but was brushed off with no response.

49. Mr. Connolly then proceeded to assign him a menial maintenance task normally reserved for junior, less skilled employees.

50. Over the past year, Mr. Bleau was assigned such tasks less than a handful of times and only when the crew was short. The crew was not short that day.

51. Following the meeting, Mr. Bleau became dizzy and felt like he was going to vomit. He tried to go to Mr. Connolly's office, but his door was shut and he was on the phone so he sent him a text message indicating that he needed to take a personal day.

52. The next morning, Mr. Bleau got up and tried to get ready for work but again felt dizzy and unsafe to work so he texted Mr. Connolly that he needed to take a PTO or personal day prior to the start of shift.

53. When Mr. Bleau returned to work on April 17, Mr. Connolly told him to put in PTO for his absences on April 13 and 14. He did as he was instructed.

54. On April 21, 2023, without any resolution or acknowledgement of his pay shortage, Mr. Bleau was abruptly and unexpectedly terminated from employment for alleged time and attendance issues dating back to February.

55. The stated reasons for discharge were false, pretextual and in direct retaliation for Mr. Bleau's assertion of his FLSA rights. Namely, his request to be compensated for all hours worked and to receive overtime for all hours in excess of 40 in a work week.

## LEGAL ALLEGATIONS

### COUNT I
### Violation of the Fair Labor Standards Act
### 29 U.S.C. 201 *et seq.*
### *(Siemens Gamesa)*

56. Siemens Gamesa's employees were either (1) engaged in commerce; (2) engaged in the production of goods for commerce; or (3) employed in an enterprise engaged in commerce or the production of goods.

57. While employed by Siemens Gamesa, Mr. Bleau was engaged in commerce either through (1) work related to actual movement of commerce; (2) work that regularly uses the channels of commerce; or (3) work related to the instrumentalities of commerce.

58. Siemens Gamesa's annual sales exceed $500,000 and it employs more than two persons, so the FLSA applies in this case on an enterprise basis.

59. Siemens Gamesa employed Mr. Bleau within the meaning of the FLSA.

60. During the two week pay period covering May 2 – 15, 2022, Mr. Bleau worked 116 hours total, consisting of 80 hours of regular time, 32 hours of overtime, and 4 hours of double time.

61. He was only paid, however, for 80 hours of regular time and 17 hours of overtime.

62. During the two week pay period covering May 16 – 29, 2022, Mr. Bleau worked 106 hours total, consisting of 80 hours of regular time and 26 hours of overtime.

63. His corresponding paycheck, however, compensated him for 80 hours of regular time less a deduction of 2 hours of overtime and a deduction of 4 hours of double time.

64. Despite requesting payment for all hours worked and overtime due, Mr. Bleau was never compensated for the hours he was shorted in May 2022.

65. During the two week pay period covering March 6, 2023 through March 19, 2023, Mr. Bleau worked 138.5 hours total, consisting of 80 hours at his regular rate, 40.5 hours of overtime (time and one-half), and 18 hours of double time.

66. On March 24, 2023, however, he was only paid for 80 hours of regular time, 17.5 hours of overtime, and 10 hours of double time.

67. Despite requesting payment for all hours worked and overtime due, Mr. Bleau was not compensated for the hours he was shorted in March 2023 while employed by Siemens Gamesa or as part of his final paycheck issued May 5, 2023.

68. On June 16, 2023, well after his final paycheck and only after his attorney sent a litigation hold letter and request for personnel records to his employer, Mr. Bleau did receive a direct deposit for $2,411.45, purporting to represent 24.25 hours of retroactive overtime and 8 hours of retroactive double time for unspecified work.

69. Mr. Bleau is entitled to payment for unpaid overtime.

70. Mr. Bleau is also entitled to liquidated damages and attorneys' fees and costs associated with this action.

## COUNT II
## Retaliation in Violation of the Fair Labor Standards Act

## 29 U.S.C. 215(a)(3)
### (*Siemens Gamesa*)

71.    Mr. Bleau incorporates the preceding paragraphs.

72.    Mr. Bleau exercised his FLSA rights by notifying his immediate supervisor, Mr. Connolly, and payroll that he was shorted pay and requesting that he be made whole.

73.    Instead of looking into the shortage, Mr. Connolly began treating Mr. Bleau differently than other employees by:

    a.    Requiring Mr. Bleau to take PTO retroactively (when he previously indicated that he did not need to take PTO);

    b.    Assigning him work he normally would not be assigned without any reason or justification other than to demean Mr. Bleau;

    c.    Rebuking him for going home for a quick lunch, which was a common, accepted practice.

74.    Mr. Bleau suffered further adverse employment action when, instead of remedying the shortfall, Mr. Connolly terminated his employment for alleged time and attendance problems and falsification of payroll records.

75.    Siemens Gamesa's alleged reason for terminating him is pretextual and baseless because:

    a.    Locally, the use of personal days did not require 24 hours' advance notice.

    b.    Locally, the use of PTO for sick days did not require 24 hours' advance notice.

      c.    Mr. Bleau did not use PTO for his absences in February because his supervisor indicated he did not need to.

      d.    Mr. Bleau did not falsify his time records.

76.    Mr. Bleau's request for payment of wages and overtime that were due to him was the real reason for his termination.

77.    Mr. Connolly further retaliated against Mr. Bleau following his termination by "blacklisting" his rental properties with Siemens Gamesa's employees, vendors, and contractors.

78.    Siemens Gamesa is responsible for the actions of its agent Mr. Connolly under a theory of respondeat superior.

79.    Siemens Gamesa's conduct constitutes unlawful retaliation against Mr. Bleau in violation of his rights under the FLSA, 29 U.S.C. §215(a)(3).

80.    As a direct and proximate result of Siemens Gamesa's wrongful acts and omissions, Mr. Bleau has suffered and continues to suffer substantial losses, including past and future lost wages, benefits, and profits.

81.    Mr. Bleau is also entitled to liquidated damages and attorneys' fees and costs, and other legal and equitable relief as recoverable by law.

## COUNT III
**Tortious Interference with Advantageous Business Relationship or Expectancy**
**(Siemens Gamesa & Kyle Connolly)**

82.    Mr. Bleau incorporates the preceding paragraphs.

83.    Mr. Bleau owns two short-term rental properties in Garden, Michigan:

      a.    The Ore House, 1981 II Rd. Garden, MI 49835.

      b.    Vans Harbor Hideout, 15860 17th Rd., Garden, MI 49835.

84. Prior to his discharge, Mr. Bleau's properties were routinely rented out by employees, vendors and contractors affiliated with Siemens Gamesa.

85. Mr. Bleau had a reasonable expectation that his income properties would continue to be rented out due to their convenient location to Siemens Gamesa's Garden Peninsula worksite and favorable reviews and feedback from renters.

86. Following his discharge from Siemens Gamesa, rentals from Siemens Gamesa employees, vendors, and contractors all but ceased.

87. Only one contractor affiliated with Siemens Gamesa has rented from Mr. Bleau since April 20, 2023, Mr. Angel Reyes.

88. Mr. Reyes initially booked the property for six nights from June 3, 2023 – June 8, 2023, as another guest was booked for the weekend of June 9-11.

89. The day after checking in, he indicated that he would likely book the rental for the rest of his stay. After he reported to the jobsite on Monday, he never reached out again, although he was seen in town.

90. On information and belief, Siemens Gamesa's agent, Mr. Connolly has actively discouraged employees, vendors, and contractors from renting Mr. Bleau's rental properties.

91. Mr. Connolly's actions are intentional, malicious, and unjustified.

92. Mr. Connolly's efforts to sabotage Mr. Bleau's vacation rental business were made for or on behalf of Siemens Gamesa.

93. Alternatively, Mr. Connolly's actions were motivated by personal animosity towards Mr. Bleau.

94. Mr. Connolly's actions have caused Mr. Bleau substantial harm in the form of lost profits from his short-term rental business.

95. As a direct and proximate result of Mr. Connolly's unlawful actions, Mr. Bleau has suffered and continues to suffer embarrassment, emotional distress, mental anguish, lost profits, and attorney fees and costs.

## Jury Demand

Mr. Bleau demands a jury trial.

## Relief Requested

*W H E R E F O R E*   Mr. Bleau requests this honorable Court grant him the following relief:

A. Accept jurisdiction over this matter;

B. Award Mr. Bleau economic damages for his past and future loss of wages and benefits, plus interest;

C. Award Mr. Bleau damages for his past and future lost profits, plus interest;

D. Award Mr. Bleau liquidated damages pursuant to 29 U.S.C. 216(b);

E. Award Mr. Bleau non-economic damages for emotional distress and mental anguish;

F. Order Siemens Gamesa to reinstate Mr. Bleau to his previously held position or, in lieu of reinstatement, award him front pay (including benefits);

G. Award Mr. Bleau all costs and reasonable attorneys' fees incurred in connection with this action; and

  H. Grant Mr. Bleau such additional or alternative relief as the Court deems just and proper.

        Respectfully submitted,

        Attorneys for Plaintiff:

        *s/Wendy Marcotte*

January 9, 2024      Wendy Marcotte (P74769)
        MARCOTTE LAW PLLC
        102 W. Washington St., Ste. 217
        Marquette MI 49855-4350
        (906) 273-2261
        wendy@marcottelaw.us